UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BOBBIE W., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00456-DLP-JMS |
| | ) | |
| NANCY A. BERRYHILL, Deputy | ) | |
| Commissioner for Operations, Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

### Order on Complaint for Judicial Review

Plaintiff Bobbie W.[1] requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of her

application for Social Security Disability Insurance ("DIB") under Title II of the

Social Security Act ("the Act"). *See* 42 U.S.C. §§ 423(d), 405(g). For the reasons set

forth below, this Court hereby **REVERSES** the ALJ's decision denying the Plaintiff

benefits and **REMANDS** this matter for further consideration.

## I. Background

### A. Procedural History

On February 27, 2014, Bobbie W. filed for disability insurance benefits under

Title II of the Act, alleging her disability began on October 15, 2013. The claims

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court
Administration and Case Management Committee regarding the practice of using only the first
name and last initial of any non-government parties in Social Security opinions. The Undersigned
has elected to implement that practice in this Order.

were denied initially and upon reconsideration. The Plaintiff then filed a written request for a hearing on August 11, 2014, which was granted.

On April 28, 2016, Administrative Law Judge William Sampson conducted the hearing, where Bobbie and a vocational expert testified. On August 12, 2016, the ALJ issued an unfavorable decision finding that the Plaintiff was not disabled as defined in the Act. The Appeals Council denied Bobbie's request for review of this decision on July 26, 2017, making the ALJ's decision final. The Plaintiff now seeks judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## B. Factual Background

Bobbie was born on June 13, 1963, and was 50 years old at the time of the alleged onset date in 2013. [Dkt. 10-5 at 2 (R. 203).] She completed four or more years of college [Dkt. 10-6 at 7 (R. 225).]. The Plaintiff last engaged in substantial gainful activity in 2014 when she worked as a Safety Facilitator at Zachary Industrial [Dkt. 10-5 at 13 (R. 214).] She has past relevant work history as a job coordinator and distribution clerk. [Dkt. 10-6 at 7 (R. 225).]

## C. Medical History

On June 13, 2012, Bobbie presented to the Veterans Administration Hospital in Indianapolis for various imaging studies due to widespread joint pain. [Dkt. 10-8 at 34-39 (R. 434-440).] An x-ray of the lumbar spine revealed degenerative disc and facet disease, while an x-ray of the right hand revealed degenerative joint disease. [*Id.*]. Bobbie returned to the Indianapolis Veterans Administration Hospital ("VA")

on July 25, 2013 for a follow-up on her psoriatic arthritis[2]. [Dkt. 10-8 at 16 (R. 417).]
It was noted that her back pain had been treated for several years with steroid
injections to the sacroiliac joint. [Id.] She was diagnosed with psoriatic arthritis,
sacroiliac joint disorder[3], fibromyalgia[4], and peripheral neuropathy[5]. [Id at 418]. It
was suggested that Bobbie continue with steroid joint injections due to her previous
positive responses. [Id.].

On October 19, 2013, Bobbie returned to her rheumatologist, Dr. Labib
Ayoub, for bilateral sacroiliac joint injections. [Dkt. 10-7 at 95-6 (R. 393-94).] Her
sacroiliac joint disorder was appreciated to be mechanical, because her imaging
studies did not show sacroiliitis[6]. [Id.]

Bobbie presented to Dr. Ami Rice on April 2, 2014 for a physical consultative
exam at the request of the Disability Determination Bureau. [Dkt. 10-8 at 56-60 (R.
357-361).] She reported hip and back pain, for which she had been receiving steroid
injections every six months, knee pain, and numbness in her feet with a pins and

---

[2] Psoriatic arthritis is a form of arthritis that causes joint pain, stiffness, and swelling, along with red patches topped with silvery scales on the skin. No cure exists, so treatment is focused on preventing damage to the joints and managing pain. Without treatment, psoriatic arthritis may be disabling. https://www.mayoclinic.org/diseases-conditions/psoriatic-arthritis/symptoms-causes/syc-20354076

[3] The sacroiliac joint (SI joint) connects the hip bones to the sacrum, the triangular bone between the lumbar spine and the tailbone. SI joint dysfunction can sometimes cause lower back and/or leg pain. https://www.spine-health.com/conditions/sacroiliac-joint-dysfunction

[4] Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, accompanied by fatigue, sleep, memory, and mood issues. https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780

[5] Peripheral neuropathy often causes weakness, numbness, and pain, usually in your hands and feet. People generally describe the pain as stabbing, burning, or tingling. Medications can reduce the pain. https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061

[6] Sacroiliitis is inflammation in one or both of the sacroiliac joints, which causes pain in your buttocks or lower back. https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747

needles sensation. [*Id.*] It was noted that Bobbie had tried physical therapy and water therapy, with good result, but had resorted to using a cane for stability. [*Id.*] Bobbie reported that she could sit for 30-45 minutes, stand for 3-4 minutes at a time, lift up to 10 pounds, and drive a car for up to 45 minutes. [*Id.*]

During the examination with Dr. Rice, Bobbie's gait was slow and antalgic while using a cane. [*Id.*] She had psoriatic plaques across her body, could not oppose the thumb to the fourth and fifth digits on her right hand, and had limited range of motion in her shoulder and left hip. [*Id.*] Dr. Rice diagnosed Bobbie with psoriatic arthritis, fibromyalgia, neuropathy, gastroesophageal reflux disease, obesity, and a sinus infection. [*Id.*]

On April 10, 2014, Bobbie returned to the Indianapolis VA for follow-ups with dermatology and rheumatology. [Dkt. 10-9 at 40-45 (R. 554-59).] Dermatologist Jennifer Croix noted larger, well demarcated psoriasis plaques throughout Bobbie's body, for which phototherapy and continued medication were recommended. [*Id.*] Dr. Ayoub with rheumatology noted a positive Faber test[7], along with hand and ankle swelling. [*Id.*] Bobbie was diagnosed with psoriasis with a worsening skin rash, psoriatic arthritis, sacroiliac joint disorder, and fibromyalgia. [*Id.*] She received bilateral sacroiliac joint steroid injections. [*Id.*]

Bobbie presented to psychologist Richard Casserly, Psy.D, HSPP, LCAC on June 3, 2014 for a psychological consultative examination at the request of the

---

[7] The FABER (Patrick's) Test stands for Flexion, Abduction, and External Rotation and is designed to assist in diagnosis of conditions at the hip, lumbar, and sacroiliac region. https://www.physio-pedia.com/FABER_Test

Disability Determination Bureau. [Dkt. 10-9 at 3-6 (R. 517-20).] She reported that because she could no longer work due to pain, she had experienced a great deal of anxiety and stress. [*Id.*] Dr. Casserly diagnosed Bobbie with adjustment disorder with anxiety and panic-like symptoms, "which may develop at some time to a more serious anxiety disorder." [*Id.*]

On July 10, 2014, Bobbie returned to Dr. Ayoub with the rheumatology department at the Indianapolis VA. [Dkt. 10-10 at 43-48 (R. 615-20).] The exam showed decreased sensation over the left thumb, a positive Phalen's test[8] on the left side, and bony enlargement of multiple fingers and wrist joints. [*Id.*] She was diagnosed with psoriasis with a worsening skin rash, psoriatic arthritis, sacroiliac joint disorder, fibromyalgia, and likely bilateral carpal tunnel syndrome. [*Id.*] She was advised to continue receiving sacroiliac joint steroid injections every six months and referred to occupational therapy for wrist splints. [*Id.*]

Bobbie reported to Melissa Sloop for an occupational therapy consult on July 28, 2014, where she reported numbness, occasional tingling, and dropping items with both of her hands, along with a history of bilateral hand arthritis. [Dkt. 10-10 19-21 (R. 591-93).] Sloop provided education on carpal tunnel syndrome and fitted Bobbie with wrist orthoses. [*Id.*] On November 20, 2014, Bobbie underwent an electromyography (EMG)[9] test due to her complaints of right arm paresthesias.

---

[8] The Phalen's test is designed to diagnose carpal tunnel syndrome.
[9] An EMG is a diagnostic procedure used to assess the health of muscles and the nerve cells that control them. https://www.mayoclinic.org/tests-procedures/emg/about/pac-20393913

[Dkt. 10-16 at 19 (R. 1073).] The test revealed right median neuropathy of the wrist (carpal tunnel syndrome). [*Id.*]

On December 9, 2014, Bobbie returned to Dr. Thomas Webster for chronic pain management. [Dkt. 10-16 at 9-14 (R. 1063-68).] She had complaints of joint pain in her right shoulder, right hand, and bilateral hips and knees, along with tingling and burning sensations in both feet. [*Id.*] Due to painful left lumbar radiculopathy with a positive left-sided straight leg raising test, she was scheduled for an MRI of the lumbar spine. [*Id.*] She was also referred to Physical Medicine & Rehabilitation ("PM&R") for a course of physical therapy for her knee and back pain. [*Id.*]

On December 15, 2014, Bobbie followed up with Dr. Webster for her left knee pain. [Dkt. 10-15 77-81 (R. 1037-41).] She described hearing a popping sound in her knee, with associated pain and swelling; furthermore, she had been using a cane to walk. [*Id.*] She was referred for x-rays and a CT scan to rule out a tibial plateau fracture. [*Id.*] The x-rays showed a moderate sized suprapatellar joint effusion and a Baker's cyst, while the MRI showed a lateral meniscus tear. [Dkt. 10-13 at 29-30 (R. 790-91).] Bobbie also underwent an MRI of the lumbar spine on December 15, 2014, which revealed a disc bulge at L2-L3 with mild facet arthropathy; disc bulges at L32-L4 and L4-L5 with mild central canal stenosis; and facet arthropathy and moderate bilateral foraminal stenosis at L5-S1. [Dkt. 10-13 at 32-33 (R. 793-94).]

On January 27, 2015, Bobbie presented to Sullivan County Community Hospital for her final physical therapy visit. [Dkt. 3-12 at 10 (R. 727-33).] She had

completed eight (8) physical therapy sessions, but still experienced pain in the 4 to 8 range on a 0 to 10 scale in her left knee, and in the 4 to 10 range on a 0 to 10 scale in her lower back. [*Id.*] Bobbie filled out a report of her condition post-physical therapy, wherein she noted that she could not squat, bend, stoop, kneel, walk long distances, walk outdoors, climb stairs, hop, jump, run, push, or pull. [*Id.*]

Dr. Ayoub evaluated Bobbie in follow-up on February 3, 2015. [Dkt. 10-15 at 47-49 (R. 1007-09).] It was noted that she had several psoriatic plaques, bony enlargements of multiple fingers, and leg and ankle swelling. [*Id.*] She received a left knee steroid injection and was referred to a physical therapist for a cane evaluation. [*Id.*] That same day, Physical Therapist Lora Pangallo evaluated Bobbie's use of a cane and demonstrated the proper use of a standard cane for ambulation, walking up and down stairs, and navigating curbs. [Dkt. 10-15 at 46 (R. 1006).] On March 16, 2015, the Plaintiff emailed Dr. Webster, informing him that her knee continued to swell, that her back pain had been worsening, and that the home exercises were not effective at relieving her symptoms. [Dkt. 10-15 at 9 (R. 969).]

On April 28, 2015, Bobbie returned to Dr. Ayoub for a follow-up on her psoriatic arthritis and fibromyalgia. [Dkt. 10-14 at 68-70 (R. 934-36).] Her psoriasis had greatly improved since starting Stelara in February 2015, but she had experienced no improvement in her chronic low back pain. [*Id.*] She received a left knee steroid injection and bilateral steroid injections in her sacroiliac joint. [*Id.*]

Bobbie presented to the Emergency Department at the Indianapolis VA on May 14, 2015, complaining of left hip and buttock pain. [Dkt. 10-14 at 57-59 (R. 923-25).] She walked with a mild degree of limping to the left leg, even with the aid of a cane, and was diagnosed with a left hip sprain. [*Id.*]

On October 1, 2015, Dr. Ayoub evaluated Bobbie in follow-up of her psoriatic arthritis and fibromyalgia. [Dkt. 10-17 at 68-70 (R. 1155-57).] Her skin rash had almost entirely cleared up, but there was no improvement in her chronic low back pain. [*Id.*] Her last sacroiliac joint steroid injection provided relief for only about two months and she further reported new pain and swelling in the knuckles of her right hand. [*Id.*] She was given bilateral steroid injections in her sacroiliac joint and was recommended for a possible right carpal tunnel steroid injection if her symptoms continued to worsen. [*Id.*] Bobbie returned to the Dermatology clinic on October 7, 2015 for an injection of Stelara. [Dkt. 10-17 at 59 (R. 1146).]

On October 13, 2015, the Plaintiff spoke with Dr. Ayoub's office and informed them that she continued to have swelling in her hands and knuckles due to synovitis. [Dkt. 10-17 at 56 (R. 1143).] She was prescribed a higher dose of azathioprine. [*Id.*] Bobbie returned to Dr. Ayoub on December 1, 2015 for follow-up on her psoriasis, psoriatic arthritis, and fibromyalgia. [Dkt. 10-17 at 33-36 (R. 1120-23).] Since starting Stelara, her rash had cleared, but she continued to have persistent arthralgias and low back pain. [*Id.*] She further reported a marked decrease in hand joint pain and swelling, mainly in the right hand, and a decrease in low back pain from a 10 to a 7 on the 0 to 10 scale. [*Id.*]

On December 21, 2015, Bobbie returned to Dr. Ayoub for complaints of persistent nausea, abdominal discomfort, diarrhea, chills, night sweats, and fever. [Dkt. 10-17 at 22 (R. 1109).] These symptoms occurred after the increase in azathioprine and had improved after she stopped taking the medication; Dr. Ayoub advised Bobbie to stop taking azathioprine. [*Id*.] On January 12, 2016, Bobbie returned to the Dermatology department for follow-up of her chronic psoriasis. [Dkt. 10-18 at 31-32 (R. 1210-11). She reported no new flare-ups or psoriasis plaques, but that her chronic joint pain and swelling had worsened in her hips and hands. [*Id*.] She was advised to continue with her quarterly Stelara injections. [*Id*.]

On January 25, 2016, Dr. Webster evaluated Bobbie in follow-up for her left knee and back pain. [Dkt. 10-18 at 24-29 (R. 1203-08).] His previous referral to PM&R in December 2014 resulted in a course of unsuccessful physical therapy. [*Id*.] Bobbie had been referred to PM&R a second time in April 2015, but she never received a response from the clinic regarding treatment; Dr. Webster submitted the referral again during this visit. [*Id*.] During the examination, Dr. Webster noted moderate effusion and tenderness in the left knee, tenderness along the paraspinal muscles bilaterally, and increased pain during the Faber test. [*Id*.] Bobbie received a steroid injection in her left knee. [*Id*.]

The Plaintiff called Dr. Webster's office on March 4, 2016 to inquire about the results of her MRI scan. [Dkt. 10-19 at 45 (R. 1263).] She was informed that no abnormalities were found in the back and shoulder area where she was experiencing pain and that her only recourse would be physical therapy. [*Id*.]

Bobbie returned to the Dermatology department at the VA on April 1, 2016, where she received another Stelara injection. [Dkt. 10-19 at 50 (R. 1268).]

On April 4, 2016, Bobbie returned to Dr. Ayoub for follow-up on her psoriasis, psoriatic arthritis, and fibromyalgia. [Dkt. 10-19 at 48-55 (R. 1267-273).] She continued to experience worsening hand joint pain and back and hip pain, for which she received bilateral sacroiliac joint steroid injections. [*Id.*] On the same day, Bobbie followed up with the PM&R Clinic for her two year history of left knee pain. [Dkt. 10-19 at 35-39 (R. 1253-57).] She reported significant swelling in her knee and that she needed to use a cane for ambulation. [*Id.*] Since she had received a steroid injection from Dr. Ayoub, she was referred to pain management for further treatment. [*Id.*]

## II. STANDARD OF REVIEW

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-

step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a
> severe impairment or combination of impairments; (3) the claimant's
> impairment meets or equals any impairment listed in the regulations
> as being so severe as to preclude substantial gainful activity; (4) the
> claimant's residual functional capacity leaves [her] unable to perform
> [her] past relevant work; and (5) the claimant is unable to perform any
> other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation

omitted). An affirmative answer to each step leads either to the next step or, at

steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520;

*Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three,

terminates the inquiry and leads to a determination that the claimant is not

disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step

four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the

Commissioner at step five. *Id*. The Commissioner must then establish that the

claimant—in light of her age, education, job experience and residual functional

capacity to work—is capable of performing other work and that such work exists in

the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine

whether it was supported by substantial evidence or is the result of an error of law.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial

when it is sufficient for a reasonable person to conclude that the evidence supports

the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard

demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Plaintiff is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

## III. ALJ'S SEQUENTIAL FINDINGS

In determining whether Bobbie qualified for disability benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). The ALJ first determined that the Plaintiff met the insured status requirements of the Act through December 31, 2018, even though she had engaged in substantial gainful activity between January 2014 and March 2014 [Dkt. 10-2 at 25 (R. 24).]

At step two, the ALJ found Plaintiff's severe impairments to include "degenerative disk disease, osteoarthritis[10], degenerative joint disease of the knees, psoriatic arthritis, fibromyalgia, bilateral carpal tunnel syndrome, and obesity," along with the non-severe impairments of gastroesophageal reflux disease, hyperlipidemia, tinnitus, sinusitis, and anxiety. [Dkt. 10-2 at 25-26 (R. 24-25).]

As noted above, the third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listings include medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for a listed impairment, then the claimant is presumptively disabled and qualifies for benefits. 20 C.F.R. § 404.1520(a)(4)(iii). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals a Listing, specifically considering Listing 1.02 for major joint

---

[10] It appears that the ALJ erred in including osteoarthritis as one of Bobbie's impairments, because that diagnosis is not present in the record.

dysfunction, Listing 1.04 for disorders of the spine, Listing 3.03 for asthma, Listing 14.09 for inflammatory arthritis [Dkt. 10-2 at 27-28 (R. at 26-27).]

At the fourth step of the five-step sequential evaluation process, the ALJ weighed the medical evidence, the vocational expert's testimony, and Bobbie's testimony and work history, and determined that Plaintiff had the RFC to perform sedentary work, except with the limitations that she could:

- stand and/or walk for two hours of an eight-hour workday;

- sit for six hours of an eight-hour workday;

- occasionally climb ramps and stairs;

- never climb ladders, ropes, or scaffolds;

- occasionally balance, stoop, kneel, crouch, and crawl;

- perform constant, but not frequent, handling, fingering, and feeling bilaterally; and

- have no exposure to heat and cold, and breathing irritants such as fumes, odors, dusts, and gases.

[Dkt. 10-2 at 28 (R. 27).] Based on her RFC, the ALJ determined that Bobbie was capable of performing her past relevant work as a job coordinator and as a distribution clerk. [Dkt. 10-2 at 34 (R. 33).] Based on these findings, the ALJ concluded that Bobbie is not disabled under the Act. [*Id.*]

## IV.   DISCUSSION

Plaintiff argues generally that substantial evidence fails to support the ALJ's determination that she was not disabled, but focuses on two main contentions: 1) that the ALJ improperly concluded that the Plaintiff's alleged symptoms were not

supported by evidence in the record and 2) that the ALJ erred by relying on the vocational expert's testimony. The Court considers these arguments in turn below.

### i.     Evaluation of Plaintiff's Symptoms

First, the Plaintiff contends that the ALJ wrongly assessed her credibility and improperly valued the impact of her alleged symptoms. The ALJ's credibility determinations are entitled special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apel*, 226 F.3d 809, 811 (7th Cir. 2000).

In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p[11] and articulate the reasons for the credibility determination. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 16-3p lays out a two-step process for evaluating a claimant's subjective symptoms: 1) determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms; 2) evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit her ability to perform work-related activities. SSR 16-p, 2017 WL 5180304 at *4.

---

[11] SSR 16-3p became effective on March 28, 2016, replacing SSR 96-7p and requiring an ALJ to assess a claimant's subjective symptoms rather than his credibility. The "change in wording is meant to clarify that [ALJ's] aren't in the business of impeaching claimants' character; obviously [ALJ's] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Federal courts remain bound by prior case law concerning the credibility analysis under SSR 96-7p.

Here, the ALJ noted that Bobbie suffers from degenerative disk disease, psoriatic arthritis, fibromyalgia, bilateral carpal tunnel syndrome, and asthma. For several years, Bobbie has consulted numerous medical professionals, been prescribed narcotic pain medication, and undergone various medical procedures including steroid injections in her knee and back. Yet, according to Bobbie, the pain in her back and knees persists. In reviewing the medical evidence and the testimony presented at the hearing, the ALJ found that Bobbie's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." This language, however, is "meaningless boilerplate." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The ALJ, however, goes on to provide an extensive review of the objective medical evidence to justify his conclusion that Bobbie's "allegations are not consistent with the evidence." In assessing her credibility, the ALJ discussed at length Bobbie's history of complaints and years of medical attention for her fibromyalgia and psoriatic arthritis claims. The ALJ noted testimony and evidence from physician appointments, including reports of Bobbie's complaints of pain; prescriptions for narcotic pain medications; x-rays which revealed mild degenerative diseases; and the reports from consultative examinations. Finally, the ALJ concluded that Bobbie's allegations were not supported by the evidence.

The Plaintiff's contention is that the ALJ improperly weighed her credibility by only listing a series of mild objective findings to justify his conclusion that her complaints were not supported by the medical evidence.[12]  Plaintiff relies on her significant history of complaints, treatment with narcotics, numerous spinal steroid injections and a left knee injection, and two courses of physical therapy to demonstrate the extent of her pain.

The Commissioner, in turn, argues that the ALJ properly considered all relevant medical evidence in the record, as laid out in the extensive recounting of Plaintiff's medical history. She appears to assert that the totality of the ALJ's opinion lends support to the ALJ's conclusion that the Plaintiff's allegations were not supported by the record.

While the ALJ adequately completed step one of the credibility assessment in determining whether any of Bobbie's impairments could produce her alleged symptoms, he did not properly complete step two of the analysis. Here, in evaluating the intensity and persistence of Bobbie's pain, the ALJ failed to explain which of Bobbie's statements were not credible and the extent to which they were not credible.

In assessing a claimant's credibility, an ALJ must explain which of a claimant's symptoms are not credible and the extent to which they are not credible. *Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir. 2011). In *Martinez,* the Seventh

---

[12] Plaintiff further points to the fact that an ALJ previously found the Plaintiff disabled for the very same conditions at issue, only one year prior to her alleged onset in this case. [Dkt. 10-3 at 6-13 (R. 101-08).]

Circuit reversed an ALJ's adverse credibility finding where there was "no explanation of which of [the claimant's] statements are not entirely credible or how credible or noncredible any of them are," rendering the ALJ's finding "suspended over air." *Id* at 696-97.

The ALJ appears to rely on the lack of objective medical evidence in assessing Bobbie's credibility regarding the extent of her pain. As outlined numerous times in this Circuit, an ALJ may not discredit a claimant's subjective complaints of pain and limitations solely because of a lack of corroborating objective medical evidence. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Villano,* 556 F.3d at 562; *Carradine v. Barnhart,* 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain."); *See also Hall v. Colvin*, 778, F.3d 688, 691 (7th Cir. 2015) (noting that an ALJ erred in her "belief that complaints of pain, to be credible, must be confirmed by diagnostic tests.").

The ALJ exhaustively lists the objective evidence contained in the record and states his conclusion that Bobbie's statements are not credible; what the ALJ does not do is create any bridge between the two. No explanation is provided about which allegations are or are not credible, an undertaking which is required in this Circuit. Instead, the Court is left to guess which of Bobbie's statements are not credible and the extent to which they are not credible. As noted above, although an ALJ is not required "to address in writing every piece of evidence or testimony presented, he was required to provide 'an accurate and logical bridge' between the evidence and his conclusions." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v.*

*Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). It is impossible, at this time, for the Court to assess whether the ALJ properly determined Bobbie's credibility, because there is no bridge between the evidence in the record and the ALJ's conclusion.

There are undoubtedly other problems with the ALJ's opinion. For example, the ALJ did not discuss Plaintiff's lengthy work history[13], her persistent efforts to seek treatment to relieve pain and discomfort so that she could continue working, or the limitations on Plaintiff's daily activities from the physical pain and symptoms that she described both to her physicians and at the hearing. Finally, the ALJ mentions that the Plaintiff's cane is not prescribed, but does not engage in any analysis of whether the cane was medically required, as is necessary under SSR 96-9p. These issues cannot be determined, however, unless and until the ALJ engages in a proper credibility analysis. On remand, the ALJ must revisit his credibility determination and decide what weight, if any, he will give to Bobbie's statements.

### ii. Vocational Expert Testimony

The Plaintiff argues that the vocational expert's testimony was flawed and that the ALJ's reliance on said testimony constituted clear error. Specifically, the Plaintiff notes that the vocational expert ("VE") provided inaccurate codes from the Dictionary of Occupational Titles ("DOT"), misrepresented the actual requirements and exertion levels of her past relevant jobs, and provided flawed responses to the ALJ's hypotheticals.

---

[13] "A claimant with a good work record is entitled to [a finding of] substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

At Step Four of the five step sequential analysis, the ALJ must determine whether the medical impairments found at Step Two have any impact on the claimant's ability to do past work. The SSA will find that a claimant is "not disabled" at Step Four when it determines that he or she retains the RFC to perform 1) the actual functional demands and job duties of a particular past relevant job or 2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy. SSR 8 2-61; *Lauer v. Bowen*, 818 F.2d 636, 640 (7th Cir. 1987) (per curiam). The ALJ must determine whether a claimant is physically capable of returning to her former work by ascertaining the demands of that work in relation to the claimant's present physical capacities. *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984); 20 C.F.R. § 404.1520(e). The ALJ cannot simply describe a claimant's job in a generic way, e.g. "sedentary" or "light," and "conclude, on the basis of the claimant's residual capacity, that she can return to her previous work." *Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir. 1991).

Both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citing *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). When a VE provides testimony in response to a hypothetical question that accurately describes the claimant in all significant relevant respects, that testimony provides substantial evidence to support an ALJ's findings about the claimant's work abilities. *Jelinek v. Astrue,* 662 F.3d 805, 813 (7th Cir. 2011).

The Plaintiff here challenges the ALJ's conclusion that she can perform her past relevant work, both as a "job coordinator" and as a "distribution clerk." In her brief, Plaintiff points out that there is conflicting testimony from the vocational expert related to the appropriate DOT title and number for the position of job coordinator. At the hearing, counsel for Plaintiff requested clarification of whether the job coordinator position involved sedentary or light work. The VE confirmed that the position as performed by Plaintiff was light work, while the DOT description involved only sedentary work. The VE further testified that Plaintiff could perform the role of job coordinator as outlined in the DOT.

ALJs are only required to consider whether the claimant can perform a past relevant job as outlined in the DOT or as actually performed, but not both. SSR 82-62. Here, the VE testified that Bobbie could not perform the role of job coordinator as actually performed, because it required an exertion level of light work; but the VE also testified that Bobbie could perform the role of job coordinator as defined in the DOT. There seems to be substantial evidence, therefore, to support the ALJ's conclusion that Bobbie could perform her past relevant work as a job coordinator at the sedentary level as described in the DOT.

The Plaintiff's second argument relates to the job of distribution clerk. During the hearing, the ALJ asked Bobbie questions associated with her work as a distribution clerk, resulting in the conclusion that although the DOT lists this job under the exertion level of light work, Bobbie performed it at the sedentary level. Based upon this information, the VE testified that Bobbie could perform her past

work as a distribution clerk, because her RFC allowed for a range of sedentary work with postural and environmental limitations.

Counsel for the Plaintiff is correct in noting that the DOT description for the distribution clerk does not resemble the actual job duties that Bobbie performed; that issue is irrelevant here, however, because the VE applied Bobbie's RFC to the job of distribution clerk as she described it at the hearing, rather than to the description in the DOT. There seems to be substantial evidence, therefore, to support the ALJ's conclusion that Bobbie could perform her past relevant work as a distribution clerk at the sedentary level.

The Court, however, declines to conclude whether the ALJ's decision should be affirmed on the issue of the vocational expert's testimony. On re-evaluation of Bobbie's credibility, the ALJ may alter his conclusions related to her condition, which may in turn affect her RFC assessment. The Court cannot now weigh the validity of the vocational expert's testimony without the ALJ first having engaged in a proper credibility analysis related to the claimant's allegations.

## D. CONCLUSION

For the reasons detailed herein, this court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4) as detailed above. Final judgment will issue accordingly.

So ORDERED.

Date: 8/21/2018

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

22

Distribution:

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kathryn.olivier@usdoj.gov

Matthew Frederick Richter
KELLER & KELLER LLP
mrichter@2keller.com

Catherine Seagle
SOCIAL SECURITY ADMINISTRATION
catherine.seagle@ssa.gov

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com